Eduardo MACHADO, Plaintiff,

v.

GOODMAN MANUFACTURING
COMPANY, L.P. and Goodman
Holding Company, Defendants.

Civil Action No. H–96–0493.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 26, 1997.

Robert Louis Norton, Rodolfo Gomez, Dena H. Sokolow, Martin Pico, Hogg, Allen, Norton and Blue, Coral Gables, FL, for Eduardo Machado.

James Vincent Carroll, III, Kimberly Gee Stith, Littler Mendelson, Houston, TX, for Goodman Mfg. Co., LP and Goodman Holding Co., Inc.

## MEMORANDUM OPINION AND ORDER

ATLAS, District Judge.

Plaintiff Eduardo Machado ("Plaintiff") has brought this action against Defendants Goodman Manufacturing Company, L.P. and Goodman Holding Company,[1] alleging that he was discriminated against on account of his national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* and, as a result of the discrimination, was constructively discharged from his employment. Pending before the Court are Defendants' Motion for Summary Judgment [Doc. # 41] and Defendants' Motion to Strike Plaintiff's Notice of Filing and Attached Documents [Doc. # 63]. The Court has considered these motions, the responses and replies, all other matters of record in this case, and the relevant authorities. For the reasons described below, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART,** and Defendants' Motion to Strike is **GRANTED.**

## I. FACTUAL BACKGROUND

Plaintiff Eduardo Machado began working for Defendant Goodman Manufacturing Company, L.P., a manufacturer and distributor of air conditioning equipment, in January 1991 in the position of Regional Sales Manager for Mexico, Latin America, and the Caribbean.[2] For four years, Plaintiff remained in this position, working out of his home in Miami,

---

1. Although Plaintiff named "Goodman Holding Company, Inc." as a defendant in this action, Defendants have pointed out that the correct name for this defendant is simply "Goodman Holding Company." *See* Defendants' Memorandum of Authorities in Support of Defendants' Motion for Summary Judgment ("Summary Judgment Brief") [Doc. # 42], at 1 n. 2.

2. Defendants argue that Plaintiff was employed by Goodman Manufacturing Company, L.P., and not Goodman Holding Company, and that therefore Goodman Manufacturing Company, L.P. is the only proper defendant in this action. *See* Defendants' Summary Judgment Brief, at 1 n. 2. In support of this argument, Defendants assert that Goodman Holding Company is merely the general partner of Goodman Manufacturing Company, L.P. and that Goodman Holding Company does not itself have any employees besides for its officers. *See id.* In response to this argument, Plaintiff has presented evidence that these two corporations are both controlled by the same individuals, *see* Transcript of Deposition of John B. Goodman ("Goodman Deposition"), Exhibit 6 in Plaintiff's Appendix of Evidence in

Florida. During this period, while he was based in Miami, Plaintiff claims that he was never subject to discriminatory treatment in connection with his employment.

In March 1995, Plaintiff was promoted to the position of Vice President of International Sales, for which he was relocated to Houston, Texas. After his relocation, Plaintiff claims that he began to suffer discrimination on the basis of his national origin, Cuban. In particular, Plaintiff asserts that he was subject to discriminatory remarks by another Goodman Vice President, Barry Watson, and that Watson's and other Goodman executives' discriminatory treatment of him created a hostile environment that was severe enough to compel Plaintiff ultimately to resign his position.

Plaintiff claims that his work environment became so hostile that, in June 1995, he sought and received permission from Thomas Burkett, Goodman's President and CEO, to return to Miami to perform his duties as Vice President from his home office. However, even after Plaintiff returned to Miami, he claims that Watson, who was apparently at that point made Plaintiff's supervisor, continued his discriminatory harassing behavior which interfered with Plaintiff's ability to perform his job. After complaining fruitlessly to Burkett of Watson's behavior, Plaintiff resigned in August 1995. Subsequently, Plaintiff brought this action alleging that he was subject to national origin discrimination that led to his constructive discharge.

In support of his allegation of discrimination that ultimately led to his constructive discharge, Plaintiff has submitted the following evidence.

First, Plaintiff complains about his treatment in connection with his promotion to Vice President of International Sales. For instance, he testifies that although he had been promised the position by the outgoing Vice President, John Goodman (the son of Harold Goodman, the company's founder), Burkett (who himself had recently become the President and CEO after the death of Harold Goodman) was hesitant about placing Plaintiff in that position. Plaintiff submits evidence that Burkett advertised for the position in trade journals and made Plaintiff go through an interview in order to obtain the position. After attaining the position, Plaintiff states that he received less compensation than his predecessor, who was not Cuban, and was given a substandard office. *See* Plaintiff's Factual Response [Doc. # 54], at 4–7, and summary judgment evidence cited therein.

Plaintiff contends that after his move to Houston, he "was faced with fellow VPs who were disrespectful, undermined his authority, embarrassed him in front of clients, and made discriminatory comments regarding his national origin." Plaintiff's Factual Response, at 7. For example, Plaintiff testifies that when he was preparing for a business trip to Asia to determine what new products

Support of Plaintiff's Response to Defendants' Motion for Summary Judgment ("Appendix to Response") [Doc. # 56], at 12–13 (members of Goodman's immediate family completely own Goodman Holding Company, and Goodman Holding Company completely owns Goodman Manufacturing Company, L.P.). Plaintiff contends that there is therefore a factual issue regarding whether the two corporations are so interrelated and integrated as to be treated as a single entity for purposes of Title VII. *See.* Plaintiff's Response in Opposition to Defendants' Motion for summary Judgment and Statement of Material Facts Which Remain Disputed ("Factual Response") [Doc. # 54], at 3 n. 1 (citing *Ratcliffe v. Insurance Co. of North America*, 482 F.Supp. 759, 764 (E.D.Pa.1980) (parent holding company which controlled the stock of subsidiary company that employed plaintiff and which was controlled by some of the same individuals as controlled subsidiary company was treated as employer under Title VII)). Because the parties

have not fully briefed this issue, the Court declines to determine at this juncture which corporate entity may be held liable if Plaintiff obtains a judgment in this case. Although several Courts of Appeal have held that a parent company can be liable under Title VII if it controls the employment practices and decisions of the subsidiary or if it otherwise dominates the subsidiary's operations, *see Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497, 513–14 (3d Cir.1996); *Johnson v. Flowers Industries, Inc.*, 814 F.2d 978 (4th Cir.1987); *Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir.1985), Texas law generally requires proof of fraud in order to pierce a corporate veil, at least for breach of contract claims. *See Thrift v. Estate of Hubbard*, 44 F.3d 348, 353 (5th Cir.1995). The parties have not addressed the question of whether corporate liability should be determined in this action by reference to federal Title VII law or by reference to state corporate law.

the company should buy, another Vice President, Peter Alexander, instructed him simply to "play dumb" and bring back brochures for the other managers to consider. Transcription of Plaintiff Eduardo Machado's August 6, 1996, Deposition ("Machado Deposition"), Exhibit 1 to Appendix to Response [Doc. # 56], at 173. In Thailand, one of the companies Plaintiff was scheduled to visit informed Plaintiff that, prior to his arrival, the company had received a phone call telling them that Plaintiff was not the decision maker for his company and that he was only there to look over equipment and pick up brochures. *See* Machado Deposition, at 185.

Plaintiff submits evidence of several overtly discriminatory remarks made to him by Watson in front of other employees. On three separate occasions, Watson told Plaintiff that he did not want Cubans living in his neighborhood. *See* Machado Deposition, at 136–38; Deposition of James R. Plant ("Plant Deposition"), Exhibit 9 to Appendix to Response, at 9–15; Statement of David Parks ("Parks Statement"), Exhibit 22 to Appendix to Response.[3] On another occasion, Watson referred to Plaintiff as "our little Cuban." Deposition of Barbara Harvey ("Harvey De-

position"), Exhibit 7 to Appendix to Response, at 12–13.

In May 1995, Plaintiff tendered a letter of resignation to Burkett, informing Burkett of the discriminatory treatment he believed he had experienced, including Watson's remarks about not wanting Cubans in his neighborhood. *See* Exhibit 17 to Appendix to Response.[4]

Burkett convinced Plaintiff not to resign and initiated an investigation into the alleged discriminatory comments by Watson. Defendants claim that Burkett took prompt remedial action, including threatening Watson with termination if his discriminatory conduct continued. *See* Defendants' Summary Judgment Brief [Doc. # 42], at 7–9, and summary judgment evidence cited therein. Plaintiff denies that the investigation was conducted properly and denies that Burkett's purported remedial action was effective. *See* Plaintiff's Factual Response, at 10–12, and summary judgment evidence cited therein.

After Watson was reprimanded, Plaintiff claims that Watson made another offensive remark referring to Plaintiff's national origin[5] and that Watson continued to harass

---

**3.** Plaintiff testifies, "As I was looking for homes in the Houston area and getting information from my coworkers about different neighborhoods, [Watson] would jump into the conversation and say he did not want Cubans in his neighborhood." Machado Deposition, at 136–37. "He said, 'I don't want Cubans in my neighborhood, and I'm not going to tell you where I live.'" *Id.* at 138. One of Machado's co-workers, James Plant, testifies that Watson told Machado that a subdivision they were discussing "didn't allow Cubans." Plant Deposition, at 10. Another co-worker wrote the following statement describing a similar incident:

Ed Machado, Barry Watson and I were in my office discussing Ed's relocation to Houston. Ed inquired about the Woodlands and I provided some general information about housing, schools, etc. I told Ed that he should come out to the area and see what is available. I also told Ed that if he was considering a move to the north side of Houston there were other nice areas he should check such as Barry's subdivision. I asked Barry if he was aware of any houses for sale or lease in his neighborhood. Barry responded that he didn't want Cubans moving into the neighborhood. Barry then left my office. Ed shook his head and then left. Ed was very upset by Barry's remark, which I also perceived Barry's statement to be an ethnic slur.

Parks Statement.

**4.** In this letter, Plaintiff wrote the following:

[I]t appears that the position [of Vice President] was in title only. In reality, not only have I not been allowed to make the decisions that the position calls for, I am no longer allowed the decision making authority of my previous position. To make matters worse, I have been looked down upon and treated with disrespect. I have had senior personnel make derogatory remarks such as "I don't want Cubans living in my neighborhood" and have been told to "shush" in the middle of an office meeting. Furthermore, prior to my departure to the Far East, I was told to "play dumb." During my visit in Thailand, I was told by the companies I visited that they were informed that I was not the decision maker and that I was only there to look over equipment and pick up brochures. As someone who has dedicated his whole life to this industry, this situation was not only very embarrassing, but extremely degrading.

**5.** Plaintiff testifies that at a dinner with clients at which Burkett was present, during a conversation about Cuban baseball, Watson remarked, "Don't talk about Cubans. Ed gets upset." Machado Deposition, at 230–31.

him by interfering with his ability to perform his job and slighting him on various occasions in front of clients.[6]

Because he found his work environment so hostile, Plaintiff sought and received permission from Burkett in June 1995 to return to Miami to perform his duties as Vice President from his home office. Despite Plaintiff's problems with Watson, Burkett assigned Watson to supervise Plaintiff after his return to Miami. *See* Deposition of Barry Watson, Exhibit 12 to Appendix to Response, at 48 (testifying that Burkett said, "Ed, I'll let you go back to Miami, but henceforth you will report to Barry").

After his move back to Miami, Plaintiff testifies that Watson continued to humiliate him and interfere with Plaintiff's ability to perform his job. For example, Plaintiff testifies that Watson repeatedly intercepted faxes and international correspondence to and from Plaintiff and responded to letters addressed to Plaintiff. *See* Factual Response, at 17, and summary judgment evidence cited therein. Plaintiff also presents evidence that Watson denied Plaintiff's expense report, in which Plaintiff sought reimbursement for expenses he incurred equipping his home office; Plaintiff claims that the company had reimbursed several non-Hispanic employees for such expenses. *See* Factual Response, at 22, and summary judgment evidence cited therein. Watson also warned Plaintiff that his meal expenses for entertaining clients "far exceeded" the company limit; Plaintiff has submitted evidence that his expenses were no greater than those claimed by other employees, but that other employees did not receive the warning Watson gave Plaintiff. *See* Factual Response, at 22–23, and summary judgment evidence cited therein.

Plaintiff complained repeatedly to Burkett about Watson's behavior, but Burkett dismissed his complaints as petty and denied that Watson's behavior continued to be discriminatory or prejudiced. *See* Factual Response, at 17–23, and summary judgment evidence cited therein. Because he felt that,

if he remained with the company, Watson would continue to subject him to a hostile work environment and Burkett would not take action to stop Watson's discriminatory behavior, in August 1995, Plaintiff resigned from the company.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Boze v. Branstetter*, 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *See Boze*, 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. If the movant meets this initial burden, the burden shifts to the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact so as to warrant a trial. *See Texas Manufactured Hous. Ass'n v. Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997); *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 161 (5th Cir.), *cert. denied*, —— U.S.

---

**6.** For example, Plaintiff testifies that Watson embarrassed him at a meeting with clients; Watson was sitting next to Plaintiff, but when photos of the client's product were being passed around the table, Watson reached around Plaintiff and passed the photos to the person sitting on the

other side of Plaintiff. *See* Factual Response, at 15, Machado Deposition, at 220–22. On another occasion, Watson agreed to attend a business lunch with Plaintiff and some clients, but Watson did not show up. *See* Factual Response, at 17, Machado Deposition, at 124–25.

——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996); *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994).

The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *See Douglass v. United Services Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds,* 79 F.3d 1415 (5th Cir.1996) (en banc); *Little,* 37 F.3d at 1075. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

## III. *DISCUSSION*

Although Plaintiff has alleged only one "claim"—that he suffered discrimination on the basis of his national origin—the Court must examine two components of this claim: that (1) he was subjected to a hostile work environment that (2) led to his constructive discharge. A hostile environment claim is one "species" in the range of discrimination claims.

---

7. This last element may not be required when harassment is committed by a supervisor who is responsible for the terms and conditions of the plaintiff's employment, for the plaintiff's work assignment within the company, or for hiring or firing decisions. *See Nash v. Electrospace System, Inc.,* 9 F.3d 401, 404 (5th Cir.1993). *See also Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (in the case of harassment by a supervisor, "absence of notice to an employer does not necessarily insulate that employer from liability"); *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1446 (10th Cir.1997) (employer may be liable even without

## A. *Hostile Environment*

To prove that he was unlawfully subjected to a hostile work environment, Plaintiff must show:

(1) that he belongs to a protected class,

(2) that he was subject to unwelcome harassment,

(3) that the harassment was based on his protected class status,

(4) that the harassment affected a term, condition or privilege of employment, and

(5) that the employer knew or should have known about the harassment and failed to take prompt remedial action.[7]

*See Waymire v. Harris County,* 86 F.3d 424, 428 (5th Cir.1996); *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997); *DeAngelis v. El Paso Municipal Police Officers Ass'n,* 51 F.3d 591, 593 (5th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995).[8] Defendants argue that the summary judgment evidence shows that Plaintiff cannot satisfy any of these elements, other than the first. Thus, the Court will consider whether Plaintiff has raised a genuine issue of material fact on the four other requirements.

### 1. Was Plaintiff subject to unwelcome harassment?

To prove a hostile environment claim, a plaintiff must show "that the discriminatory conduct was severe or pervasive enough to create an objectively hostile or abusive work environment." *Wallace v. Texas Tech University,* 80 F.3d 1042, 1049 n. 9 (5th Cir.1996) (race discrimination case) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "In

---

notice of harassment "[i]f the employer delegated the authority to the supervisor to control the plaintiff's work environment and the supervisor abused that delegated authority by using that authority to aid or facilitate his perpetration of the harassment") (citing Restatement (Second) of Agency § 219(2)(d), clause 2).

8. Although this five-prong standard was developed in the context of hostile environment sexual harassment claims, there is no reason to doubt that it also applies to a claim of harassment on the basis of national origin.

order to be actionable ... the challenged conduct must create an environment that a reasonable person would find hostile or abusive." *Weller*, 84 F.3d at 194. In making such a determination, the courts look to factors such as the frequency of the conduct, its severity, the degree to which it is physically threatening or humiliating, and the degree to which it unreasonably interferes with an employee's work performance. Title VII "was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace," and therefore conduct that only "sporadically wounds or offends but does not hinder [an] ... employee's performance" is not actionable. *Id.* However, "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII." *Wallace*, 80 F.3d at 1049 n. 9 (citing *DeAngelis*, 51 F.3d at 593).

In this action, Plaintiff has submitted evidence that Watson's conduct interfered with Plaintiff's job performance during the period Plaintiff worked in Defendants' Houston office and after Plaintiff returned to Miami. Plaintiff characterizes Watson's conduct as humiliating and discriminatory and attests that it caused him great distress. Although it is clear that Plaintiff and Watson did not get along with one another, the Court is uncertain about whether Watson's behavior constituted sufficiently severe harassment to support Plaintiff's claim. However, because this determination rests substantially on credibility assessments, the Court declines to hold, based on the summary judgment evidence, that Plaintiff cannot succeed on his

claim. Instead, the Court concludes that Plaintiff has at least raised a fact question on the issue of whether Watson's behavior created a hostile work environment for Plaintiff.[9]

## 2. Was the harassment based on national origin?

Although Defendants admit that Plaintiff and Watson lacked a good working relationship, Defendants claim that, apart from the few overt discriminatory remarks for which Watson was promptly disciplined, Watson's behavior toward Plaintiff did not display any discriminatory animus. In response, Plaintiff appears to argue that Watson's overt discriminatory remarks demonstrate that Watson was prejudiced against Cubans and thus that his other demeaning conduct toward Plaintiff was simply further indication of his derogatory attitude toward Cubans.

Although a plaintiff must show more than isolated instances of racially motivated acts, *see Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1295 (5th Cir.1994), a defendant's use of racial slurs may constitute direct evidence that racial animus was a motivating factor in the defendant's other contested behavior, including disciplinary decisions. *See Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861–62 (5th Cir.1993). Defendants deny that the continuing problems in Watson and Plaintiff's relationship was connected in any way to Watson's earlier discriminatory remarks about Cubans. However, under *Brown*, Plaintiff may use those remarks as support for his claim that Watson's later demeaning treatment toward him was also based on discriminatory animus.[10]

9. Although Plaintiff argues primarily that Watson was responsible for subjecting him to a discriminatory and hostile work environment, Plaintiff has also attempted to bolster his claim with evidence that he was also treated in a discriminatory manner by other Goodman employees as well. This additional evidence, while not sufficient on its own to defeat Defendants' summary judgment motion, may support Plaintiff's claim. *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 475 (5th Cir.1989) (hostile environment claim may be based upon allegations of harassment by different people; "[t]he focus is whether [the plaintiff] was subjected to recurring acts of discrimina-

tion, not whether a given individual harassed [him] recurrently").

10. Because Watson's remarks about Cubans were proximate in time to the other conduct of which Plaintiff complains and because Watson is the same person who both made the remarks and engaged in the other behavior which Plaintiff claims created a hostile work environment, the Court does not consider Watson's remarks to be merely "stray remarks" that lack probative value. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir.1996) (remarks are not stray if they are: (1) related to the plaintiff's protected class status; (2) proximate in time to other incidents

In addition, Plaintiff has submitted evidence that Watson's conduct toward him was based on his national origin because Watson treated him differently from other similarly situated non-Cuban employees. For example, Plaintiff argues most strenuously that Watson displayed discriminatory bias against Plaintiff when he denied Plaintiff's reimbursement request for his home office expenditures and when he warned Plaintiff about his entertainment expenses because other non-Cuban employees received reimbursement for home office expenses and did not receive warnings for violating the company entertainment expense policy. The Court agrees with Plaintiff that evidence that Plaintiff was treated differently from other similarly situated employees outside his protected class is at least relevant to his claim that Watson's conduct was motivated by animus against Plaintiff because of his national origin.

Thus, the Court concludes that Plaintiff has presented sufficient evidence to raise a fact question on the issue of whether the alleged hostile environment that he claims to have been subjected to by Watson was based on Plaintiff's national origin.

### 3. Did the harassment affect a term, condition, or privilege of Plaintiff's employment?

As discussed earlier in Section III. A.1., the Court finds that Plaintiff has at least raised a fact question on the issue of whether Watson's treatment of him was sufficiently severe and pervasive to affect Plaintiff's ability to perform his job. If Plaintiff shows that he was subjected to a hostile work environment, that showing itself satisfies the requirement that the harassment must affect a term, condition, or privilege of Plaintiff's employment. *See Harris,* 114 S.Ct. at 370 (" '[t]he phrase "terms, conditions, or privileges of employment" evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and

women' in employment' which includes requiring people to work in a discriminatorily hostile or abusive environment") (quoting *Meritor,* 477 U.S. at 64, 106 S.Ct. 2399).

### 4. Did the employer know or should the employer have known about the harassment and failed to take prompt remedial action?

When a plaintiff is harassed by someone, other than the head of the defendant company or a supervisor who is responsible for the terms and conditions of the plaintiff's employment, the employer is liable for sexual harassment only if it knew or should have known of the harassment and failed to take prompt remedial action. *See Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996); *Nash,* 9 F.3d 401. Although Watson apparently became Plaintiff's supervisor after Plaintiff moved back to Miami, Burkett continued to control the terms and conditions of Plaintiff's employment. Thus, Plaintiff must establish that Burkett knew or should have known of Watson's discriminatory and harassing behavior but failed to take prompt remedial action to halt it.

An employer takes prompt remedial action if it " 'took the allegation seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigations.' " *Waymire,* 86 F.3d at 428 (citing *Carmon v. Lubrizol Corp.,* 17 F.3d 791, 795 (5th Cir.1994)). "Whether an employer's response to discriminatory conduct is sufficient 'will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any initial remedial steps.' " *Hirras v. National R.R. Passenger Corp.,* 95 F.3d 396, 399–400 (5th Cir.1996) (citing *Waltman,* 875 F.2d at 479).

the plaintiff claims were discriminatory; (3) made by an individual with authority over the other incidents at issue; and (4) related to the other incidents at issue). Moreover, although Defendants suggest that some of Watson's remarks, for example Watson's reference to Plaintiff as "our little Cuban" and Watson's comment to a group of clients not to talk about Cubans

because Plaintiff would get offended, were not discriminatory, an indirect comment may be probative of unlawful discriminatory intent. *See E.E.O.C. v. Manville Sales Corp.,* 27 F.3d 1089, 1094–95 (5th Cir.1994) (statements that plaintiff was an "old man" and "old and inflexible" reflected overall negative tone of supervisor in speaking about age).

Defendants argue that Watson was promptly reprimanded for the only discriminatory behavior which Watson directed toward Plaintiff—Watson's remarks about Cubans. Plaintiff denies that the reprimand was adequate or effective. More importantly, Plaintiff claims that, despite the reprimand, Watson continued treating him in a discriminatory and demeaning manner. Plaintiff has submitted evidence that, after the reprimand, Plaintiff complained to Burkett that Watson was still subjecting him to a discriminatory and hostile environment and that Burkett simply denied that Watson's behavior was motivated by discriminatory animus.[11] It is undisputed that Burkett took no further action against Watson. As described above, the Court finds that Plaintiff has raised a fact question on the issue of whether Watson's conduct toward Plaintiff, after Watson was reprimanded for his remarks about Cubans, was discriminatory. If it was in fact discriminatory, then Plaintiff may succeed on his hostile environment claim because this fact would indicate that the reprimand was ineffective.

Because Plaintiff has raised fact questions on each of the foregoing elements, the Court holds that Plaintiff is entitled to a trial on the issue of whether he was subjected to a hostile environment on the basis of his national origin.[12]

## B. Constructive Discharge

Because he was unwilling to tolerate a discriminatory and hostile work environment, Plaintiff claims that he was constructively discharged. In order to prove constructive discharge, Plaintiff's working conditions must be so difficult or unpleasant that a reasonable person in his shoes would have felt *compelled* to resign. *See Ward v. Bechtel Corp.*, 102 F.3d 199, 202 (5th Cir. 1997); *Landgraf v. USI Film Prods.*, 968 F.2d 427, 429–31 (5th Cir.1992), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). "The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation, then the employer has committed a constructive discharge and is as liable as if it had formally discharged the aggrieved employee." *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 242–43 (5th Cir.1993). However, "[p]roof is not required that the employer imposed these intolerable working conditions with the specific intent to force the employee to resign." *Jurgens v. E.E.O.C.*, 903 F.2d 386, 390 (5th Cir.1990).

11. On July 5, 1995, Plaintiff wrote a memo to Burkett which included the following complaint:

Despite ... various conversations we have had regarding Mr. Watson's attitude towards me, I am again faced with a total lack of disrespect [sic] and lack of cooperation on his part. It has come to my attention that Mr. Watson has been receiving my correspondence and responding to letters and faxes that were addressed to me ...

I can accept the fact that certain attitudes and prejudices can not [sic] be changed. What I can not [sic] accept, however, is the fact that Mr. Watson continues to be allowed to express his opinions by openly disrespecting me to such an extent that he has taken it upon himself to assume my job responsibilities.

Please advise me as to what is going to be done with this situation.

Exhibit 29 to Appendix to Plaintiff's Response. In response to this memo, Burkett held a conference call with Plaintiff and Watson and sent a memo to Plaintiff that included the following:

You have accused Barry of being disrespectful and prejudiced. He was not being disrespectful, but simply responding to customer requests he felt were in the administrative realm of his responsibilities. As for being prejudiced, you, Barry and I met regarding his comments about you moving into his neighborhood. He apologized and you told me you were satisfied he was only joking and you were satisfied with the steps we had taken to discipline him.

Exhibit 31 to Appendix to Plaintiff's Response.

12. Defendants argue that Plaintiff's case cannot survive summary judgment because Plaintiff, in his deposition, denied or expressed no opinion as to whether specific examples of Watson's conduct were motivated by discriminatory animus. *See* Defendants' Reply to Plaintiff's Second Supplemental Response to Defendants' Motion for Summary Judgment [Doc. # 79], at 3, 5, 7, 8, 10. The Court is unpersuaded. In the aggregate, Plaintiff has submitted sufficient evidence to create fact questions as to whether he was subject to a discriminatory hostile environment. This ruling is, however, not a ruling under the standards applicable to Fed.R.Civ.P. 50(a) or to support entry of judgment after trial, as to which the Court is required to give the trial evidence different scrutiny. There will be a serious question at trial as to whether Plaintiff can support a verdict if he has nothing more than the evidence presented here.

In order to show constructive discharge, Plaintiff's "resignation must have been reasonable under all the circumstances." *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir.1994). In *Barrow,* an age discrimination case, the Fifth Circuit listed a number of employment conditions that may indicate that an employee's resignation was reasonable:

> Whether a reasonable employee would feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Id.* This list of factors is "non-exclusive." *Ward,* 102 F.3d at 202 (plaintiff may succeed on claim of constructive discharge by presenting other evidence that his employer placed him an "intolerable work environment"). Because in *Barrow* the Fifth Circuit derived these factors from age discrimination cases, *see* 10 F.3d at 297 n. 20, the fifth and seventh factors listed above obviously do not apply literally to a case of national origin discrimination. In the context of a claim for national origin, race, or sex discrimination, the fifth factor must be characterized as reassignment to work under a supervisor who subjected the plaintiff to discriminatory or harassing behavior. *See Cortes v. Maxus Exploration Co.,* 977 F.2d 195 (5th Cir.1992) (affirming judgment for plaintiff who claimed she was constructively discharged when employer reassigned her to work under supervision of employee who had previously sexually harassed her). Likewise, the seventh factor may be better characterized simply as an offer of voluntary *resignation* "on terms that would make the employee worse off whether the offer was accepted or not." *Barrow,* 10 F.3d at 297.

In order to prove that he suffered a constructive discharge, Plaintiff must demonstrate " 'a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.' " *Weller,* 84 F.3d at 195 n. 7 (quoting *Landgraf,* 968 F.2d at 429). In this case, the Court finds that Plaintiff has presented just barely enough evidence to create a fact question on the issue of hostile environment. Thus, Plaintiff's evidence is not sufficient to survive summary judgment under the more stringent test required to prove constructive discharge.

Plaintiff has not presented evidence from which a jury could find that a reasonable person in Plaintiff's position would have felt compelled to resign. In particular, Plaintiff has failed to submit evidence to show that Defendant demoted him, reduced his salary, significantly reduced his job responsibilities,[13] assigned him to menial or degrading work,[14] or made him an offer of voluntary

---

**13.** Although Plaintiff argues that his promotion to Vice President was not accompanied by as substantial an *increase* in responsibilities as he expected, it does not appear that Plaintiff argues that his job responsibilities were ever *reduced* during the time he was in Houston. To the extent that Plaintiff's job responsibilities were reduced after his return to Miami, however, Defendant has presented substantially uncontroverted evidence that those changes were necessitated by the fact that Plaintiff was no longer working in Defendant's Houston office. Although Plaintiff argues that, after his return to Miami, Watson attempted to interfere with Plaintiff's performance of his job responsibilities by responding to correspondence addressed to Plaintiff, Plaintiff has not submitted evidence that his job responsibilities themselves were reduced.

**14.** Plaintiff argues that he felt degraded by Watson's attempts to take over Plaintiff's responsibil-

ities after Plaintiff returned to Miami. However, even assuming Plaintiff's rendition of the facts to be accurate, Plaintiff has not shown that he was subjected to degrading enough conditions to establish that he was constructively discharged. In *Guthrie v. Tifco Industries,* 941 F.2d 374 (5th Cir.1991), an age discrimination case, the Fifth Circuit found a *prima facie* case of constructive discharge where the plaintiff was demoted from Vice President to Senior Buyer, had his salary reduced by 40%, and was assigned to work for a man with less experience who was seventeen years younger than the plaintiff. Even though the plaintiff established his *prima facie* case, the court nevertheless affirmed summary judgment for the employer because the plaintiff failed to raise a fact issue as to whether the employer's proferred reasons for its actions were pretextual. In the case at bar, Plaintiff has not even offered as much evidence in support of his *prima facie* case as did the plaintiff did in *Guthrie.*

resignation. As to the fifth factor described in *Barrow*, although it appears that after Plaintiff's return to Miami, Defendant assigned Plaintiff to report to Watson (the person who Plaintiff claims had subjected him to discriminatory and harassing behavior), this evidence is not sufficient to raise a fact question on constructive discharge. Plaintiff's contact with Watson, after the two were no longer working in the same city, was limited and could not, under the facts presented in the summary judgment evidence, have reasonably led Plaintiff to feel compelled to resign. Likewise, as to the sixth *Barrow* factor, although Plaintiff claims that he was harassed by Watson, Plaintiff has not presented sufficient evidence to show that this alleged harassment was severe enough to compel Plaintiff to resign. When Plaintiff complained of the alleged harassment, Burkett allowed Plaintiff to relocate to Miami to avoid working closely with Watson. Plaintiff's complaints regarding Watson after Plaintiff returned to Miami are simply not serious enough for Plaintiff to show constructive discharge.

 A defendant may defeat a plaintiff's claim of constructive discharge by showing that the plaintiff's true motivation for resigning was his "conflicts and unpleasant relationship" with his co-workers, unrelated to any discrimination or hostile work environment he might have suffered. *See Landgraf,* 968 F.2d at 430. In *Landgraf,* the Fifth Circuit affirmed a district court's entry of judgment for an employer, based on the district court's finding that the plaintiff resigned because of conflicts with co-workers that were unrelated to her prior claim of sexual harassment. *See id.* In the case at bar, the Court finds that Plaintiff has likewise failed to present sufficient evidence to show that the reason for his resignation was connected to Watson's alleged harassment of him on the basis of Plaintiff's national origin.

Because Plaintiff has not presented sufficient evidence to support his claim that he suffered severe enough discrimination and a hostile enough work environment that would compel a reasonable person in his position to resign, the Court grants Goodman's Motion for Summary Judgment as to Plaintiff's claim of constructive discharge.

***Defendants' Motion to Strike*** [Doc. # 63].—Defendants have moved to strike evidence submitted by Plaintiff regarding an employment advertisement Defendants placed in a trade journal shortly before Plaintiff's resignation. Plaintiff argues that this evidence demonstrates that, during the period in which Plaintiff claims he was subjected to a hostile environment, Defendants expected and intended for Plaintiff to resign, and thus the evidence is probative of Plaintiff's claim that he was constructively discharged. Defendants argue that the advertisement was not for Plaintiff's position and so the evidence is irrelevant to the case. Because the Court has found that Plaintiff's situation was not unpleasant enough to compel him to resign and Plaintiff's constructive discharge claim is now dismissed, the Court finds that the evidence is indeed irrelevant and thus inadmissible. Defendants' Motion to Strike is granted.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. # 41] is **GRANTED IN PART** and **DENIED IN PART** in accordance with this Memorandum Opinion and Order. Plaintiff's claim that he was constructively discharged because of his national origin is dismissed, but his claim that he was subject to a discriminatory hostile work environment on account of his national origin is retained. It is further

**ORDERED** that Defendants' Motion to Strike Plaintiff's Notice of Filing and Attached Documents [Doc. # 63] is **GRANTED.**