**Willie J. McKINNEY, Plaintiff,**

v.

**TEXAS DEPARTMENT OF TRANSPORTATION, Defendant.**

**No. CIV.A. 3:99CV.1009D.**

United States District Court, N.D. Texas, Dallas Division.

April 17, 2001.

---

924

Keith H. Cole, Jr., Law Office of Keith H. Cole, Jr., P.C., Dallas, TX, for Plaintiff.

John Cornyn, Atty. Gen. of Texas, Andy Taylor, First Asst. Atty. Gen., Jeffrey S. Boyd, Deputy Atty. Gen. for Litigation, Grady C. Click, Asst. Atty. Gen., Chief, Transp. Div., and Elsa Ulloa, Asst. Atty Gen., Austin, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

Plaintiff Willie J. McKinney ("McKinney") sues defendant Texas Department of Transportation ("DOT") alleging that DOT violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, by terminating his employment based on his African–American race.[1] DOT

---

1. The court on August 24, 1999 dismissed without prejudice his claims for relief under 42 U.S.C. § 1983 and the Texas Commission

moves for summary judgment. The court must decide whether the Supreme Court's decision in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), affects the availability of summary judgment in this case. For the reasons that follow, the court grants the motion.[2]

## I

DOT employed McKinney from 1986 until September 28, 1998. DOT maintains that it terminated his employment because, during a meeting in which DOT supervisory personnel were advising McKinney (who had been a problem employee) that it was extending the probationary period that he was currently undergoing, McKinney made a statement that the other attendees perceived as a threat in the workplace. McKinney alleges that the real reason for his termination is his African–American race and sues under Title VII for race discrimination. DOT moves for summary judgment.[3]

## II

■ McKinney's Title VII race discrimination claim is governed by the familiar burden shifting framework defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and applied by the Supreme Court most recently in *Reeves.* Under this framework, a plaintiff first must establish a prima facie case of discrimination. *See Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. Once he meets this burden, the defendant is obligated to produce a legitimate, nondiscriminatory reason for the employment decision at issue. *See id.* This is a burden of production, not persuasion, and involves no credibility assessment. *See id.* Once the defendant meets this production burden, the presumption of discrimination disappears. *Id.* The factfinder must decide the ultimate question whether the plaintiff has proved intentional discrimination. *See St. Mary's Honor Ctr. v.. Hicks,* 509 U.S. 502, 511–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000). At the summary judgment stage, the plaintiff must only raise a genuine issue of material fact that the defendant discriminated against him. *La-Pierre v. Benson Nissan, Inc.,* 86 F.3d 444, 449 (5th Cir.1996).

■ The plaintiff may meet his burden of proof by establishing "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *See Reeves,* 530 U.S. at 143, 120 S.Ct. 2097. "A mere scintilla of evidence of pretext does not create an issue of material fact in all cases." *Crawford v. Formosa Plastics*

---

on Human Rights Act, Tex. Labor Code Ann. §§ 21.001–21.405 (West 1996 & Supp.2001), and dismissed with prejudice his claim for punitive damages. *See* Aug. 24, 1999 Order at 2.

2. McKinney's February 5, 2001 motion to strike is denied. McKinney maintains that the affidavits of several DOT employees should be stricken because they do not state that the testimony contained in them is true and correct, thereby preventing perjury from being assigned to them. Because the affidavits are explicitly made under oath, this argument lacks merit. McKinney also moves to strike the documents referred to in the affidavit of Timothy Powers ("Powers"). Because the court has not relied on this evidence, it denies this part of the motion to strike as moot.

3. The court has not considered for any purpose DOT's supplemental appendix filed February 20, 2001 because it is impermissible under either the pre–1998 or the present summary judgment rules. *See Tovar v. United States,* 2000 WL 425170, at *4 n. 8 (N.D.Tex. Apr. 18, 2000) (Fitzwater, J.), *aff'd,* 244 F.3d 135 (5th Cir.2000) (table) (per curiam).

*Corp.,* 234 F.3d 899, 902–03 (5th Cir.2000). Rather, a plaintiff must adduce *"sufficient* evidence to find that the employer's asserted justification is false." *Id.* at 903 (emphasis in original) (quoting *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097). "It is, therefore, possible for a plaintiff's evidence to permit a *tenuous* inference of pretext and yet be insufficient to support a *reasonable* inference of discrimination." *Id.* (emphasis added); *see also Reeves,* 530 U.S. at 148, 120 S.Ct. 2097 (noting that summary judgment would be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"). The sufficiency of a plaintiff's evidence "must be made on a case-by-case basis, depending on the nature, extent, and quality of the evidence[.]" *Crawford,* 234 F.3d at 903. As the Fifth Circuit pointed out in its recent opinion in *Okoye v. The University of Texas Houston Health Science Center,* 245 F.3d 507 (5th Cir.2001):

> The Supreme Court has also made clear, however, that instances exist where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Id.* at 514 (internal quotations and brackets deleted).

## III

DOT argues that even if McKinney can establish a prima facie case, *see* D. Br. at 3 (assuming that McKinney can prove a prima facie case), he cannot prove that DOT's legitimate, nondiscriminatory reason for firing him is pretextual. The court will therefore determine if DOT has met its burden of production and, if it has, will decide whether McKinney has introduced evidence that is sufficient to permit a rea-

sonable trier of fact to find intentional discrimination.

### A

The court holds that DOT has met its burden of production. DOT has offered evidence that it hired McKinney in 1986 as a Maintenance Technician I. He worked initially at the Haskell Maintenance Section but transferred to the Stamford Maintenance Section as a result of a conflict with his supervisor, Glenn Jennings ("Jennings").

In May 1998 DOT gave McKinney a written reprimand and placed him on probation for one year based on conduct that reflected negatively on DOT. This discipline was imposed as a result of a citizen complaint that he had been rude and belligerent during a gas purchase transaction involving a DOT vehicle. Although McKinney and Gary Liner ("Liner"), the station owner who made the complaint, differ in their accounts of what occurred— particularly concerning how McKinney behaved toward Liner—there is no apparent dispute that McKinney departed the station without paying for the fuel, thus requiring his coworker, Philip Escobedo ("Escobedo"), to complete the transaction. At the time DOT placed McKinney on probation, it examined his behavioral history to determine the appropriate remedial action. DOT placed him on probation for a period of one year because his record contained several acts of insubordination and confrontations with coworkers. DOT warned McKinney that if he violated other DOT policies or performance standards during the probationary period, he could be disciplined further, including termination of employment.

In September 1998, while McKinney was still on probation, DOT amended its policies to require that employees provide their current home telephone number and

address to their immediate supervisor. In a memorandum to employees advising them of the new policy, DOT stated that if an employee did not have a home telephone, he must provide the number of a relative or neighbor where he could be reached. McKinney refused to provide a telephone number and argued about the requirement with his supervisor, Dale Tollett ("Tollett"), who told him it was a requirement of the job that he be available in an emergency. At the end of the meeting, Tollett concluded that McKinney would not provide a telephone number. As a result of this incident, Lauren Garduño ("Garduño"), who at the time was serving as DOT's Interim District Engineer for the Abilene District, decided to extend McKinney's probation for a full year, until September 1999.

On September 23, 1998 Garduño met with McKinney and advised him that his probation was being extended for one year for refusing to provide an acceptable telephone number, as required by DOT policy. Tollett, Gary Teichelman ("Teichelman"), McKinney's immediate supervisor, and Marie Batko, DOT's Interim Human Resources Officer, were also present. According to Garduño, as he was explaining the probation extension and his reasoning, McKinney stated: "You will not prosper by messing with me." D.App. 4. Based on McKinney's body language and his prior history, Garduño and the other three attendees interpreted McKinney's statement as a threat. After reviewing DOT policies, particularly its Violence in the Workplace policy, DOT decided to terminate McKinney's employment.

DOT has unquestionably met its burden of production by adducing evidence that McKinney had a troubled work history with DOT, was placed on probation for misconduct, and was terminated when he refused during his probationary period to comply with a policy directive and, during a meeting with DOT personnel, made a statement that those in attendance perceived to be threatening.

## B

Because DOT has satisfied its burden of production, McKinney is now obligated to produce sufficient evidence to permit a reasonable trier of fact to find that DOT's nondiscriminatory explanation for its decision is pretextual.

McKinney provides a different version of the events that led to his termination, arguing that the review of his behavior and the punishment imposed on him were unfair and motivated by racial prejudice. Although this evidence is sufficient to raise fact issues, for reasons the court will explain below, they are " 'not so persuasive so as to support an inference that the real reason was discrimination.' " *Crawford*, 234 F.3d at 904 (quoting *Rubinstein v. Administrators of the Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir.2000)).

Regarding the gas station incident, McKinney alleges that Liner "became ugly" with him and that he left the station, asking Escobedo to complete the transaction. McKinney maintains that the subsequent review process unfairly included instances that did not involve any disciplinary action, as well as incidents that occurred when McKinney worked under Jennings, whom McKinney felt was racially biased against him. He asserts that the May 5, 1998 Progressive Disciplinary Action Documentation Form alleged performance problems that were recently prepared by DOT's Human Resources Department. McKinney complains that Garduño considered these matters without investigating whether they had merit or were true or discussing them with him. He asserts that the statements and allegations that Garduño relied on to place him on probation in May 1998 are false.

McKinney also contends that he was the victim of discrimination in connection with the requirement that he provide a telephone number. He contends that under the policy, employees had until October 1, 1998 to provide a telephone number and address. At the time, he did not have a telephone number because he could not afford a telephone. McKinney avers that he completed the form in the best manner possible and provided it to Teichelman, his supervisor. Tollett, Teichelman's supervisor, asked McKinney the next day why he did not have a telephone number and requested that he provide a neighbor's number. McKinney could not comply because he did not have any neighbors either whom he knew or who were not regularly out of town on business. The best he could do was provide the telephone number of his mother, who lives in Wichita Falls.[4] He also contends that he requested additional time to obtain a telephone number and contacted the telephone company a few days later to request that one be installed. He argues that at the September 23, 1998 meeting, he supplied DOT a telephone number and that, through the time of the disciplinary action, Teichelman never checked to see whether he had a number. Despite his compliance with the policy, DOT prospectively wrote him up for this deficiency and his probation was extended for one year.

McKinney maintains that proof that the real reason for the disciplinary action to be imposed at the September 23, 1998 meeting was racism and discrimination can be found in the fact that he was disciplined in advance of the October 1, 1998 deadline by which he was required to supply a telephone number.[5] He maintains that the discipline imposed for insubordination concerning the telephone requirement is simply the second of three contrivances to terminate him based on his race and that DOT's Abilene Office was "papering the file" against him. See P. Br. at 19.

Finally, McKinney avers that he did not threaten Garduño during the meeting, but instead paraphrased *Isaiah* 54:17 by stating, "No weapon formed against me will prosper."[6] McKinney describes this as a prayer of protection when one is being confronted or harassed, not a threat. He also contends that threatening Garduño would have been difficult because McKinney's arm was in a sling, three attendees at the meeting were as large as, if not larger than, he, and Garduño's own statement about the meeting reveals that he did not immediately perceive the statement to be threatening, but considered it so only "[a]fter careful reflection" on this statement. P. Br. at 19 (citing P.App. 31). He also asserts that the timing of the completion of the form—filled out three days after McKinney allegedly made the statement, in a performance review prepared after he was fired—calls into question

---

4. McKinney also complains that DOT did not offer him the option of wearing a pager, despite the fact that they were available for employees who needed to be contacted in case of emergency. The evidence that he cites, however, is taken from the deposition of Powers, in which he testified that he did not actually know whether the pagers were available in September 1998, and stated that it was "possible" that they were. *See* P.App. 105. In view of the speculative nature of this evidence, it is insufficient to raise a genuine issue of material fact and the court will not address this argument further.

5. McKinney's reliance on the availability of pagers as a basis to assert pretext will not be discussed for the reasons set out *supra* at note 4.

6. The version of *Isaiah* 54:17 that McKinney cites in his appendix states: "[N]o weapon forged against you will prevail." P.App. 113 (quoting *Isaiah* 54:17 (New International Version)).

whether the statement was made or was threatening.

In addition to challenging DOT's proffered reasons for terminating him, McKinney relies on evidence that DOT management has repeatedly tolerated the use by other employees of "n—ger" and "boy" to refer to African–American DOT employees. He offers the affidavit of a former coworker, Clarence Walker ("Walker"), who states that he heard numerous racist comments spoken in the presence of management, but did not know of any disciplinary actions taken as a result. *See* P.App. 6. Walker also avers that on at least two occasions, an employee brought a noose to work but was not disciplined, which indicates that DOT condoned racism in the Abilene District.

McKinney also maintains that evidence of racial discrimination at DOT can be found in the area of promotions and training. He avers that despite his requests to take training and other courses to advance his skills and education, he was repeatedly told that classes were full. He could not attend the classes without the approval of his supervisor, Tollett, who never asked him if he wanted to take part. Yet Caucasian employees were able to take these classes after McKinney was told they were full, and other African–American employees experienced the same type of discrimination.

Additionally, McKinney traces the origin of the immediate events leading up to his discharge to the point at which Garduño became Interim District Engineer. He complains that Garduño began documenting McKinney's actions in detail and holding him to a higher standard than he applied to non-African American employees and failing to investigate whether the allegations contained in the review of his employment history were accurate. He argues that DOT knew that many instances occurred when McKinney was working under the supervision of Jennings. McKinney argues that Garduño was papering his file by including items where no disciplinary action was taken. He complains that Teichelman, his immediate supervisor, kept a detailed journal/diary of his problems with McKinney, and that Teichelman's supervisor, Tollett, also kept a diary only concerning McKinney. He asserts that this conduct is evidence of discriminatory animus.

 McKinney also relies on evidence that Caucasian employees violated DOT policy by using state vehicles to perform personal errands or business, but that they were not disciplined or fired. Yet when McKinney used a state vehicle to attend a seminar, Teichelman made a detailed effort to ascertain whether McKinney had driven more miles than necessary, and this was done to paper and document a case against him so that he could be fired based on his race.[7]

## C

 The court holds that McKinney has failed to introduce evidence that, combined with his prima facie case, would

---

7. McKinney also contends that he relies on direct evidence of discrimination to avoid summary judgment. *See* P. Br. at 23–24. The court holds that he has not introduced direct evidence in this case. Direct evidence is evidence that, without requiring a factfinder to make any inferences or presumptions, proves that a person engaged in unlawful discrimination. *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir.1994); *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993). Such evidence typically involves statements made by the employer or certain of its personnel that indicate that an employment decision was based on a forbidden factor. The court therefore rejects McKinney's assertion that DOT "did not address the direct evidence in this case[.]" P. Br. at 24.

permit a reasonable trier of fact to find pretext or intentional discrimination.

1

In support of his argument that DOT's proffered reasons for his termination are pretextual, McKinney provides evidence supporting alternate versions of the gas station incident, his response to DOT's request for a telephone number, and the September 23, 1998 meeting. This evidence, however, is not sufficient to give rise to a reasonable inference of discrimination. First, McKinney's version of the gas station incident, even if believed by the trier of fact, does not cast doubt on DOT's explanation for its actions. DOT's position is that the incident triggered a review of McKinney's employment record. Based on this review, DOT concluded that a one-year probationary period was appropriate. McKinney's assertion that Liner "became ugly" with him does not contradict this explanation because it addresses only the issue of who was at fault for the dispute, not whether it prompted a review that ultimately resulted in the imposition of probation, or whether DOT could reasonably have believed that McKinney had acted improperly.

Similarly, McKinney's different version of the events surrounding DOT's telephone number requirement does not give rise to a reasonable inference of discrimination. McKinney avers that although he did not have a number in early September, the DOT policy allowed employees until October 1 to comply, and that in the interim he offered the number of his mother in Wichita Falls. This evidence is also insufficient to survive summary judgment. DOT contends that it was McKinney's insubordination, not his failure to provide a number, that gave rise to the September 23 meeting with Garduño. *See Chaney v. New Orleans Public Facility Mgmt., Inc.,* 179 F.3d 164, 167–68 (5th Cir.1999) ("The failure of a subordinate to follow the direct order of a supervisor is a legitimate non-discriminatory reason for discharging that employee."). Moreover, McKinney's assertion that he intended his comment at the meeting to be a prayer of protection, not a threat, does not contradict Garduño's assertion that he interpreted the comment as a threat. The focus of the pretext inquiry is not how McKinney would characterize his behavior, but how DOT understood it. *See Swanson v. General Servs. Admin.,* 110 F.3d 1180, 1186 (5th Cir. 1997). McKinney's burden at this stage is to produce evidence that DOT's asserted nondiscriminatory justification is a pretext for discrimination, not that DOT misinterpreted his comment.

In order to find from the evidence that McKinney has adduced that his race was a motivating factor in DOT's decision to terminate him, a jury would be required to conclude that, after DOT had employed him for approximately 12 years, it decided in 1998 to terminate his employment because he is African–American. It used the May 1998 gas station incident—in which a private citizen initiated a complaint—to begin a process of progressive discipline that was an artifice to hide its true desire to discharge him because of his race. When he responded to a completely separate matter—the September 1998 policy that required employees to provide their current home telephone numbers and addresses—by refusing to comply, DOT prematurely extended his probation based on a discriminatory motive. And when DOT supervisors convened a meeting to advise him that his probation was being extended, McKinney did not make a statement that was in fact perceived as a work place threat; instead, DOT used McKinney's words as a pretext to terminate his employment. These findings would be unreasonable and therefore are not sufficiently persuasive to allow a rational factfinder to

conclude that the real reason for DOT's conduct was race discrimination.

2

■ McKinney also submits evidence of racial slurs that were made in the presence of DOT management. On this ground, however, McKinney has failed to demonstrate that these comments are relevant to the employment actions taken against him. Although the Fifth Circuit has recognized that the test for determining the relevance of derogatory remarks articulated in *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir.1996), "must be viewed with caution in light of *Reeves* [,]" *Evans v. City of Bishop*, 238 F.3d 586, 591 (5th Cir.2000) (per curiam), it has not held that all such remarks are sufficient to establish an inference of discrimination. Rather, a principal focus in the analysis of derogatory remarks continues to be the identity of the speaker. Therefore, while acknowledging that *Reeves* criticized the requirement that the remarks be made in the direct context of the employment action, the Fifth Circuit continues to assess whether the remarks were made by someone "principally responsible" for the employee's termination. *Russell*, 235 F.3d at 226; *see also Evans*, 238 F.3d at 591–92 (rejecting "direct context" requirement but noting that remarks were made by city council member in case involving alleged discrimination in city hiring). In the instant case, none of the remarks that McKinney and Walker assert they heard was spoken by management. Instead, McKinney maintains that because management merely expressed oral disapproval of racial slurs, and to his knowledge did not punish the speakers, it tolerated racial discrimination. Even if, as McKinney argues, this evidence is probative of DOT's actions toward him, it is not alone sufficient to raise an inference that discrimination motivated his termination. At best, the evidence establishes that McKinney and Walker were both subject to racial slurs by other DOT employees and that they were unaware of any disciplinary action taken in response. Finally, even the evidence that Teichelman heard a racial slur could not, of itself, lead a factfinder reasonably to infer discrimination because McKinney has not adduced any evidence that Teichelman had supervisory authority over the speaker such that he could have taken action against him.

3

■ McKinney also provides evidence that DOT maintains a discriminatory policy in the area of training and promotions, DOT supervisors engaged in an effort to "paper" his file, and DOT applied disciplinary measures in a disparate manner. In essence, these three arguments attempt to raise an inference of discrimination by showing disparate treatment.

■ To establish disparate treatment, a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances. In other words, the misconduct for which the plaintiff was discharged must be nearly identical to that engaged in by other employees. *Okoye*, 245 F.3d at 514. In the present case, there is no proof in the summary judgment record that DOT held McKinney to a standard that was more demanding than that applied to any particular employees who are not African-American. His accusation that Garduño held him to a different standard is unsupported by any summary judgment evidence except his own subjective opinion testimony, which is insufficient. *See, e.g., Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993) (rejecting otherwise unsupported, speculative opinion testimony). Similarly, McKinney does not provide any specific evidence of disparate treatment regarding the personal use of state vehicles. Although he complains that a Hispanic em-

**932**

ployee repeatedly used state vehicles for personal use without being disciplined, McKinney offers no instances in which he was disciplined for misusing DOT vehicles. He has failed to introduce evidence that would support a reasonable finding that employees who are not African–American received preferential treatment in "nearly identical" circumstances, as required by *Okoye* and like cases.

Moreover, McKinney's allegation that Tollett made training opportunities available to Caucasian employees but never asked him if he wanted to attend is too broad and unspecific to support a reasonable inference that DOT's reasons for McKinney's termination are pretextual. *See Swanson,* 110 F.3d at 1186 (holding incompetent to establish pattern of discrimination broad generalizations that black employees were watched more closely than were whites). Even Teichelman's admission that he kept a record of McKinney's problems, but not of other employees, could not lead a reasonable trier of fact to find pretext, because there is no evidence that other employees exhibited similar combative behavior and insubordination. The mere fact that DOT supervisors kept a detailed record of their problems with McKinney does not in these circumstances support a reasonable inference of discrimination.

4

Even when considered in combination, McKinney's evidence cannot survive summary judgment. His allegation that DOT supervisors engaged in a campaign to terminate him based on his race is unsupported in the record except by his own conclusory statements that he was the victim of discrimination by Jennings, Tollet, Teichelman, and Garduño. There is also no support for the inference that his problems related to the gas station incident and the telephone number request were contrived to justify his eventual termination. More-

over, even if McKinney's subjective opinion testimony is combined with the general allegations of DOT's tolerance of racism and disparate treatment in training and promotions, his evidence creates only a *tenuous* issue of fact concerning the question of pretext, which is insufficient to support a *reasonable* inference of discrimination. *See Crawford,* 234 F.3d at 904. Accordingly, DOT is entitled to summary judgment.

\* \* \* \* \* \*

DOT's January 9, 2001 motion for summary judgment is granted and the remaining claims in this action are dismissed with prejudice by judgment filed today.

**SO ORDERED.**