Affirmed and Opinion filed March 18, 2004









Affirmed and Opinion filed March 18, 2004.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00248-CV

____________

 

CRAIG WINTERS, Appellant

 

V.

 

CHUBB & SON,
INC. & DEANNE GORDON, Appellees

 



 

On Appeal from the 269th
District Court

Harris County, Texas

Trial Court Cause No. 01-26151

 



 

O P I N I O N

Craig Winters (AWinters@) sued Chubb &
Son (AChubb@) and Deanne
Gordon (AGordon@) for
discrimination under the section 21.051 of the Texas Commission on Human Rights
Act (ATCHRA@), intentional
infliction of emotional distress, and defamation.  He pursued Gordon separately in a suit for
fraud.  In two orders, the trial court
granted summary judgment as to all causes of action and  awarded attorney fees and costs to
Gordon.  On appeal, Winters only
challenges the grant of summary judgment on his race discrimination cause of
action against Chubb and the separate award of attorney fees to Gordon.  We affirm.








          Winters was hired by Chubb in November
1997 to work as an underwriter in Chubb=s Department of
Financial Institutions (ADFI@) section.  Immediately after being hired, Winters was
sent to training in Warren, New Jersey. Upon completing this training, Winters
returned to Houston and began working in the DFI section under Gordon=s
supervision.  Gordon managed the DFI
section until June 1998, when she was transferred to the commercial
section.  Lewis Hall, a senior
underwriter, was promoted to manage the DFI section.  Subsequently, Hall left the regional manager
position and resumed his duties as a senior property casualty underwriting
specialist for the region.  Gordon
returned to the DFI section in July 1999 and resumed her managerial
duties.    

Winters was issued his underwriting authority in January
1998.  However, Gordon and Winters met on
December 20, 1998, to discuss several issues related to Winters=s job performance,
and pursuant thereto,  Winters=s underwriting
authority was revoked.  Gordon drafted a
memo summarizing the issues and reasons for revoking his underwriting
authority.  She listed the problems
forming the basis for her decision to revoke the underwriting authority:

1. Bank United: This was a December
renewal that was brought to my attention in that we had not addressed the Y2K
issues and the Premium quoted was incorrectly calculated.

2. First American Adam Corp.  The premiums quoted were incorrect with
respects to the TIV and rate needed on the account. 

3. Eagan: There was not proper
follow-up on the Louisiana Banker program. 
It was up to Chubb to complete a market letter and we did not follow-up.

4. Sterling.  A
Venture Capital prospect had not been wipped in. 

Unsure of Winters=s abilities,
Gordon revoked his underwriting authority on December 20, 1998.  The revocation was to be reevaluated in 30
and 60 days and would include a review of his files.  This action was characterized as a Averbal warning.@








     
The revocation does not appear to have altered Winters=s official duties
as an underwriter. Winters was permitted to continue in his underwriting
duties; however,  any new lines or
renewals had to be signed off by Gordon or Lewis.  Winters testified in his deposition that his
job title stayed the same and he remained at the same pay level.[1]   

Subsequently, Gordon asked Hall to perform
an audit of all of the underwriter=s files.  In Lewis=s audit, Winters
received a majority of Agood@ marks, but the
audit also revealed that Winters needed improvement in several key areas:
adherence to underwriting guidelines, rate premium development and
documentation, pricing adequacy, and CID risk analysis report documentation.

Thirty days following the verbal warning,
Gordon met with Winters to discuss his progress.  Gordon noted in a memo that she Ahad not seen any
improvement and that he [Winters] had thirty days to correct the issues.@  She also commented that she had discussed the
need for Winters to improve his listening skills.  Included in the memo was Aan additional
example where [she] had seen issues.@  She noted that Winters had failed to
correctly calculate the numbers for American General Bonds and neglected to ask
for assistance.








Sixty days following the verbal warning,
Gordon again met with Winters to discuss the end of the verbal warning
period.  Acknowledging the effort that
Winters had put into improving,[2]
Gordon removed Winters from the performance warning.  However, an audit of his files would have to
be completed before his underwriting authority could be restored.  An external audit was performed in late March
2000 on sample files from each of the senior underwriters under Gordon=s
supervision.  Generally, Winters
performed well in the external audit. 
Only 30% of his files were considered Abelow >Good=@ and none of his
files received an Aunsatisfactory@ rating.[3]   The entire Houston DFI section received an
overall evaluation score of Agood.@  Sometime after the audit was completed, Gordon
made the decision to reinstate Winters=s underwriting
authority.   








However, Winters=s underwriting
authority was never reinstated.  Winters,
Washington, and Gordon met in early May to discuss Winters=s continuing
performance issues.  On May 2, 2000,
Gordon drafted a memo memorializing this meeting.  Additionally, the memo can be properly termed
as a Awritten
performance warning.@ 
Apparently, this written performance warning was precipitated by Winters=s decision to use
a template, rather than a customized proposal, for a large client.  Gordon asserted that part of the account was
lost because Winters failed to provide a detailed proposal.  In addition to highlighting specific problems
with clients, Gordon listed the areas in which Winters was expected to
improve.  Generally, Gordon requested
that Winters make the following changes by June 2, 2000: develop good working
relationships with assigned producers; utilize various sales techniques;
demonstrate ability to get tasks accomplished by networking within the branch;
increase quality of underwriting analysis and applications and sound pricing
techniques as by producer results, underwriting audits, file documentation and
claims activity; and attainment of business development objectives as measured
by inforce policy count, mix of business, renewal retention, and new
business.  If Winters did not meet the
objectives, Gordon indicated that further disciplinary action could result, including
possible termination. 

Winters tendered his resignation on May 19, 2000 in the
following letter:

Dear Barbara:

Please accept this correspondence
as notice of my resignation effective June 2, 2000 (two (2) weeks from today).

My association with this
institution has provided me with several enriching experiences.

Sincerely,

/s/ Craig Winters

Department of
Financial Institutions

Motion for
Summary Judgment

In his first point of error, Winters
asserts the trial court erred in granting the motion for summary judgment
because genuine issues of material fact existed.

A traditional motion for summary judgment
is properly granted only when the movant establishes that there are no genuine
issues of material fact to be decided and that he is entitled to judgment as a
matter of law.  See Tex. R. Civ. P. 166a(c); Lear
Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex.1991); Holmstrom v. Lee,
26 S.W.3d 526, 530 (Tex. App.CAustin 2000, no
pet.).  In reviewing a motion for summary
judgment, we accept as true all evidence favoring the nonmovant, indulging
every reasonable inference and resolving all doubts in the nonmovant=s favor.  Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548B49 (Tex. 1985).  A defendant seeking summary judgment must
negate as a matter of law at least one element of each of the plaintiff=s theories of
recovery or plead and prove as a matter of law each element of an affirmative
defense.  See Centeq Realty, Inc. v.
Siegler, 899 S.W.2d 195, 197 (Tex.1995). 
If the defendant establishes a right to summary judgment, the burden
shifts to the plaintiff to present evidence raising a fact issue.  See id.








Chapter 21 of the Labor Code prohibits an
employer from refusing to hire an individual, discharging an individual, or
discriminating in any other manner against an individual in connection with
compensation or the terms, conditions, or privileges of employment on the basis
of race, color, disability, religion, sex, national origin, or age.  Tex.
Lab. Code Ann. ' 21.051 (Vernon 1996).  The TCHRA is modeled on the federal Civil
Rights Act of 1991 (Title VII); therefore, Texas courts follow federal statutes
and cases in applying the TCHRA.  Quantum
Chem. Corp. v. Toennies, 47 S.W.3d 473, 476 (Tex. 2001); Russo v. Smith
Int=l, Inc., 93 S.W.3d 428, 433 (Tex. App.CHouston [14th Dist.] 2002, no
pet.).  

In analyzing cases brought under the
TCHRA, we follow the burden shifting analysis set forth in McDonnell Douglas
Corp v. Green, 411 U.S. 792, 802 (1973).[4]
 Russo, 93 S.W.3d at 434.  Under the burden shifting analysis, the
plaintiff is first required to present a prima facie case of
discrimination.  Russo, 93 S.W.3d at 434; Gold
v. Exxon Corp., 960 S.W.2d 378, 381 (Tex. App.CHouston [14th Dist.] 1998, no pet.).   If the plaintiff is successful in
demonstrating a prima facie case, the burden shifts to the defendant to produce
evidence showing a A>legitimate,
nondiscriminatory reason= for the adverse employment actions.@  Gold, 960 S.W.2d at 381 (quoting St.
Mary=s Honor Ctr v. Hicks, 509 U.S. 502,
506 (1993)).  If the defendant succeeds
in carrying his burden, the plaintiff must then prove, by a preponderance of
the evidence that the defendant=s reasons are
merely a pretext for discrimination.  Russo,
93 S.W.3d at 434 (citing Tex. Dep=t of Cmty. Affairs
v. Burdine, 450 U.S. 248, 252-53 (1981)). 
Although a prima facie case is a condition precedent to the pretext
analysis, the plaintiff need only make a minimal showing.  Russo, 93 S.W.3d at 435. 








Prima
Facie Case

To establish a
prima facie case of employment discrimination, a plaintiff must show (1) he was
a member of a protected class, (2) he suffered an adverse employment action,
and (3) nonprotected class employees were not treated similarly.  Thomas v. Clayton Williams Energy, Inc.,
2 S.W.3d
734, 739 (Tex. App.CHouston [14th Dist.] 1999, no
pet.).  Chubb asserted in its motion for
summary judgment that Winters could not establish his prima facie case.  More specifically, Chubb argued that Winters
is unable to establish that he suffered any adverse employment action or that
the nonprotected class employees were not treated similarly.  In the order granting summary judgment in
favor of Chubb and Gordon, the court did not state the specific grounds for its
ruling.  Therefore, we will affirm if any
of the theories advanced in defendant's motion for summary judgment are meritorious.  See Carr v. Brasher, 776 S.W.2d
567, 569 (Tex.1989).  

Title VII and Chapter 21 address ultimate
employment decisions; they do not address every decision made by employers that
arguably might have some tangential effect upon employment decisions.  Dollis v. Rubin,77 F.3d 777, 781-82
(5th Cir. 1995); Elgaghil v. Tarrant County Junior Coll., 45 S.W.3d 133, 142 (Tex. App.CFort Worth 2000,
pet.denied).  Generally adverse
employment decisions involve hiring, granting leave, discharging, promoting, and
compensating.  See id.  Alternatively, adverse employment actions
do not include Aevents such as disciplinary filings,
supervisor=s reprimands, and even poor performance by
the employeeCanything which might jeopardize
employment in the future.@  Mattern
v. Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir. 1997).[5]   








When an employee submits a letter of
resignation, he may still satisfy the adverse employment action element by
proving that he was constructively discharged. 
Barrow v. New Orleans Steamship Ass=n., 10 F.3d 292, 297
(5th Cir. 1994); Hammond v. Katy Indep. Sch. Dist., 821 S.W.2d 174, 177 (Tex. App.CHouston [14th Dist.] 1991, no
writ).  AA constructive
discharge occurs when an employer makes conditions so intolerable that an
employee reasonably feels compelled to resign.@  Hammond, 821 S.W.2d at 177.  In considering whether an employee acted
reasonably, the Fifth Circuit has set out factors that may be considered,
singly or in combination, in making its determination.  The factors include: (1) demotion; (2)
reduction in salary; (3) reduction in job responsibilities, (4) reassignment to
menial or degrading work; (5) reassignment to work under a younger supervisor;
(6) badgering, harassment, or humiliation by the employer calculated to
encourage the employee=s resignation, or (7) offers of early
retirement on terms that would make the employee worse off whether the offer
was accepted or not.  Barrow, 10
F.3d at 297.  In construing these
elements in light of a race discrimination case, federal courts have explained
that the fifth factor applies when the employee was reassigned to work under a
supervisor who subjected the plaintiff to discriminatory or harassing
behavior.  Machado v. Goodman, 10
F. Supp. 2d 709, 719 (S.D. Tex. 1997). 
Additionally, the seventh factor is better characterized simply as an
offer of voluntary resignation.   Id.  


We find a fact issue with regard to
whether Winters was constructively discharged. 
Winters and Gordon present differing accounts as to what was discussed
at the meeting on May 2.  Winters asserts
in his deposition that he submitted his letter of resignation in order to avoid
being terminated.  He states that Gordon
told him that he would not survive the thirty-day period of the written
performance warning.[6]  Gordon denies making such statements to
Winters.  She points to the documentation
indicating if Winters did not improve that he could be terminated.  Faced with this fact issue, we cannot affirm
summary judgment on this ground.








Chubb also asserted in its motion for
summary judgment that Winters failed to produce prima facie evidence of
disparate treatment.  The gist of Winters=s argument is that
other nonblack employees exhibited similar performance problems and were not
disciplined.  Because we decide this case
on the issue of pretext, an in-depth disparate treatment analysis will
follow.  Accordingly, we assume arguendo
that Winters produced enough evidence of disparate treatment to establish his
prima facie case.

Pretext for Discrimination

Once the plaintiff has established a prima
facie case, the defendant employer must articulate a nondiscriminatory reason
for the adverse employment action.  Gold,
960 S.W.2d at 381.  Following the Supreme
Court=s holding in Reeves
v. Sanderson Plumbing Products, 530 U.S. 133 (2000), the employer bears
only a burden of production, not of persuasion when tendering its
nondiscriminatory reason for discharging the plaintiff.  McKinney v. Tex. Dep=t Transp., 167 F. Supp. 2d
922, 925 (N.D. Tex. 2001).    Chubb
asserts that Gordon=s decisions were based on her objective
assessment of Winters=s job performance.  Having produced a nondiscriminatory reason,
we analyze whether or not there is a fact issue on the issue of pretextual
discrimination. 








Proving Apretext for
discrimination@ requires the plaintiff to show Aboth that the reason
[for termination] was false, and that discrimination was the real
reason.@  Hicks, 509 U.S. at 515.  More specific to Texas, a plaintiff pursing a
claim under the TCHRA must Ashow that
discrimination was a motivating factor in an adverse employment decision.@  Quantum, 47 S.W.3d at 482.    A mere scintilla of evidence will raise a
fact issue.  Walton v. Bisco Indus.,
Inc., 119 F.3d 368, 370 (5th Cir. 1997) (indicating that the evidence of
discrimination must be Asubstantial@); McKinney,
167 F. Supp. 2d at 925; Gold, 960 S.W.2d at 385-86 (distinguishing the
summary judgment standard under the TCHRA with Texas=s conventional
summary judgment standard).  An employer
is entitled to summary judgement Aif the record
conclusively revealed some other, nondiscriminatory reason for the employer=s decision, or if
the plaintiff created only a weak issue of fact as to whether the employer=s reason was
untrue and there was abundant and uncontroverted independent evidence that no
discrimination had occurred.@  Reeves, 530 U.S. at 148; see also
Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 994 (5th Cir. 1996), abrogated
on other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133 (2000) (determining the propriety of a summary judgment by viewing the
evidence Aas a whole@).  Similarly, a THRCA plaintiff may survive
summary judgment by either establishing a fact issue with regard to pretext or
challenging the employer=s summary judgment evidence as failing to
prove, as a matter of law, that the employer=s proffered reason
was a legitimate, nondiscriminatory reason for plaintiff=s
termination.   M.D. Anderson Hosp.
& Tumor Inst. v. Willrich, 28 S.W.3d 22, 24 (Tex. 2000).  We find that Winters could not establish
either.   

 A[A]n employee=s own subjective
belief of discrimination, no matter how genuine, cannot serve as the basis for
judicial relief.@  Martin
v. The Kroger Co., 65 F. Supp. 2d 516, 553 (S.D. Tex. 1999); Gold,
960 S.W.2d at 384. Here, there is very little evidence, outside of Winters=s subjective
belief, to show that race was a motivating factor.  Gordon did not realize that Winters was
African-American until December 1999. 
Notwithstanding this fact, Winters describes his working relationship
with Gordon between November 1997 and June 1998 as Astrained@ and explained
that she exhibited a lot of impatience.[7]  Other employees also testified that Gordon
was impatient with Winters and treated him more harshly than other
underwriters; however, it is difficult to find a fact issue on racial pretext
when the record indicates that the working relationship between Gordon and
Winters had always been less than perfect.[8]








There is no evidence to establish that
Gordon generally disliked African-Americans. 
Winters testified that he never heard Gordon make a racially-motivated
statement or use a racial epithet. Although Winters makes much of the fact that
he was the only African-American senior underwriter under Gordon=s supervision,
Gordon hired an African-American woman as an underwriter trainee, and this
trainee has since been promoted to underwriter. 
Finally, two customer service representatives were asked whether Winters
was treated differently because of his race. Pam McNeely could only state Amaybe,@ and Mary Post
stated that it initially crossed her mind, but she did not think that race was
a factor.  We believe the case law
requires more.  See, e.g., Bienkowski
v. Am. Airlines, Inc., 851 F.2d 1503, 1507 (5th Cir. 1988) (finding fact
issue in evidence that included Acomments by
[plaintiff=s] former supervisors that could be
interpreted as carrying an age-based pejorative implication,@ which qualifies
as direct evidence of discrimination); Greathouse v. Alvin
Indep. Sch. Dist., 17 S.W.3d 419, 425-26 (Tex. App.CHouston [1st Dist.] 2000, no pet.)
(finding fact issue based on manager=s tattoo
signifying African-American supremacy, comments by manager that plaintiff was a
AKKK kind of guy,@and comments by
manager that he would do whatever it took to get rid of plaintiff); Thomas,
2 S.W.3d
at 739 (finding fact issue based upon affidavit explicitly describing
preferential treatment of whites and giving specific examples of such
treatment)








Winters also points to two statements in
proving racial animus and pretext. 
First, he describes Hall=s statement that
he thought African-Americans struggled at Chubb and that he thought it was
cultural issue.  Second, Winters says
that Gordon told him, AI=m going to get
you, and I don=t like you.@ Generally, a
comment is probative of discrimination when it is A(1) related to the
plaintiff=s protected class, (2) proximate in time
to the adverse employment decision, (3) made by an individual with authority
over the employment decision, and (4) related to the employment decision at
issue.@  Elgaghil v. Tarrant County Junior Coll.,
45 S.W.3d 133, 140 (Tex.
App.CFort Worth 2000, pet.
denied).   Hall=s comment does not
meet these criteria.  Hall made the
statement after an African-American trainee from another unit resigned sometime
before Winters submitted his letter of resignation.  Further, Hall was not Winters=s supervisor and
did not have authority to discharge Winters. 
Likewise, Gordon=s comment is not probative of
discrimination.  Most importantly, there
is no indication that it was racially motivated.

Winters=s claims of
disparate treatment do not sufficiently demonstrate that he was treated
differently because of his race.  To
establish that he received disparate treatment, Winters must demonstrate that
the preferential treatment was given under Anearly identical@ circumstances;
more specifically, Winters must show that he was discharged for misconduct for
which other employees were not.  Little
v. Republic Refining Co., 924 F.2d 93, 97 (5th Cir. 1991); Smith v.
Wal-Mart Stores, 891 F.2d 1177, 1180 (5th Cir. 1990) (demonstrating
disparate treatment requires that the employees violate the same company
policy); Farrington v. Sysco Food Servs. Inc., 865 S.W.2d 247, 251 (Tex. App.CHouston [1st Dist.] 1993, writ
denied).   Winters complains that other
underwriters underwrote accounts that lost money, lost accounts, and had been
complained about by customers. 
Alternatively, Winters questioned why he was singled out in a meeting
about rate modification issues, why he was the only employee to have his
underwriting authority revoked, and why he was the only underwriter who had to
develop a business plan.  We believe the
documentation indicates that Winters suffered from a unique combination of
performance issues.          

Absent a discriminatory motive, a
disagreement between an employer and employee over assessment of job
performance is not actionable.  Martin,
65 F. Supp. 2d at 552 (describing a decision to put an employee on probation or
to terminate them as a business decision). 
A[E]ven an
incorrect belief that an employee=s performance is
inadequate constitutes a legitimate, non-discriminatory reason.@Little v. Republic
Refining Co., 924 F.2d 93, 97 (5th Cir. 1991).  The court=s role in
employment discrimination cases is not to second guess every personnel
decision.  Martin, 65 F. Supp. 2d
at 553.








Winters exerts significant effort in
refuting the documented reasons for the actions taken against him.  Interestingly, Winters does not expressly
deny having job performance issues; when asked whether he had performance
issues, he would only admit that he was Anot perfect.@   He does, however, provide explanations for
some of the incidents that Gordon highlighted in the documentation.[9]  Winters criticizes Gordon for not listening
to his explanations and blowing the incidents out of proportion.  He also challenges what has been
characterized as alleged performance deficiencies as professional differences
or differences in approach.  Further, he
complains about the level of scrutiny focused on his work.  Winters described the errors reported in Hall=s audit as Anit picky.@  Additionally, he states that he felt that
management was Aoverly critical@ of his work.   Recalling Gordon=s criticism he
states, Ashe was giving me
nothing substantive to work with where I could measure myself.  Communication, your communication skills,
your presentation skills B what kind of fuzzy, you know, math is
that?@  We are unpersuaded by Winters=s claims that the
evaluations were Atrumped up.@ See Gold,
960 S.W.2d at 384 (finding insufficient statements made in plaintiff=s affidavit and
deposition claiming improper and contrived evaluations based Aupon his
allegations that his supervisor made age-related remarks indicating a
preference for younger employees and gave the younger employees preferential
treatment@).  


Notwithstanding Winters=s complaints of
being singled out, we are unable to find sufficient evidence in the record
indicating that another employee exhibited the same list of performance issues
as Winters.  There is some evidence that
other underwriters may have committed some of the same errors as Winters;
however, there is not specific evidence of another employee committing the same
range of errors made by Winters.[10]  








Winters attempts to bolster his disparate
treatment argument by introducing evidence of his positive job
performance.  He introduced the testimony
of three other Chubb employees, Brian Specht, Pam McNeely, and Mary Post.  Winters argues that because these employees
thought he was a competent underwriter that he had demonstrating more than a
scintilla of evidence to rebut Chubb=s allegation that
Winters had exhibited continued performance issues.   See Quantum, 47 S.W.3d at 481.  However, each employment discrimination case
is unique, and we must analyze Athe nature,
extent, and quality of the evidence, as to whether a jury could reasonably
infer discrimination.@  Crawford
v. Formosa Plastics Corp, 234 F.3d 899, 903 (5th Cir. 2000).  The coworker testimony relates only to
general opinions about his job performance.  
Both McNeely and Post are not underwriters; they are customer service
representatives. McNeely admits that she has no experience managing
underwriters and is unfamiliar with the requisite evaluation criteria.  Post admits that she was Anot privy to what
was going on with what [Gordon=s] needs and the
department=s needs were from [Gordon=s] perspective.@  Specht acknowledged that he had never audited
Winters=s files and did
not interact with him on a daily basis. 
Winters also refers us to the good marks that he received in the
external audit.  Viewing his employment
record in its entirety, the positive marks are only indicative of performance
during a particular period of time, and do not explain away the long list of
documented performance issues.  See
Crawford, 234 F.3d at 903 (explaining that although the plaintiff=s most recent
evaluation was positive, the evaluation did not cover another time frame where
the employment problems allegedly occurred). 









Keeping in mind that the disparate
treatment must occur under nearly identical circumstances, we find the evidence
of disparate treatment presented here fails to rebut Chubb=s
nondiscriminatory explanation.  Mayberry
v. Vought Aircraft Co., 55 F.3d 1086, 1091-92 (5th Cir. 1995); see also
McKinney, 167 F. Supp. 2d at 932 (requiring specific instances of
preferential treatment).  Accordingly, we overrule Winters= first point of
error.

Attorney Fees 

In his second point of error, Winters
claims the trial court erred in granting Gordon attorney fees when it granted
her partial motion for summary judgment.  
In a suit brought under the TCHRA the Acourt may
allow the prevailing party . . . a reasonable attorney=s fee as part of
the costs.@  Tex. Lab. Code Ann. ' 21.259 (Vernon
1996) (emphasis added).  We review the
award of attorney fees under an abuse of discretion standard.   Greathouse v. Glidden, 40 S.W.3d 560, 571 (Tex. App.CHouston [14th Dist.] 2001, no
pet.).  A trial court Aabuses its
discretion when it reaches a decision so arbitrary and unreasonable as to
amount to a clear and prejudicial error of law.@  Johnson v. Fourth Court of Appeals, 700
S.W.2d
916, 917 (Tex. 1985).  

Winters asserts multiple grounds in his
brief and reply brief in challenging the trial court=s award of
attorney fees.  He first argues the court
improperly awarded attorney fees on plaintiff=s defamation
case.  He argues this is error because
attorney fees are not recoverable in tort actions and there was no finding of
bad faith under Rule 13.  Later, in his
reply brief, Winters asserts that he did not sue Gordon for discrimination, but
only for defamation and fraud. 
Alternatively, Winters argues that the award of attorney fees was in
error because there was no finding by the court that his discrimination suit
was Afrivolous,
unreasonable, or groundless.@ We do not find
any of these arguments persuasive.  








Winters=s first arguments
are not supported by the record.  
Winters names both Chubb and Gordon as defendants in his petition.  Further, in alleging his TCHRA cause of
action, Winters refers to the actions of defendants.  A plain reading of the petition reveals that
he was pursuing both defendants in the discrimination, intentional infliction
of emotional distress, and defamation causes of action.  Interestingly, he specifically names Gordon,
omitting Chubb,  in alleging his fraud
cause of action.  Likewise, Winters= attempt to invoke
Rule 13 is also misguided.  There is
nothing in the record, i.e., a motion for sanctions, to indicate that
the attorney fees were intended as a sanction.  


Relying on the federal standard applied in
Title VII cases, Winters also argues that the trial court made no such finding,
and the order granting summary judgment does not state that the claim was Afrivolous,
unreasonable, or groundless.@  Other courts of appeals that have addressed
attorney fees in TCHRA cases have followed the federal standard, wherein an
employer may recover attorney fees if the plaintiff=s claims Awere frivolous,
meritless, or unreasonable, or the plaintiff continued to litigate after it
became clear that his claim was frivolous.@  Elgaghil, 45 S.W.3d at 144-45.  However, findings of fact are not required in
an abuse of discretion review.  Crouch
v. Tenneco, Inc., 853 S.W.2d 643, 646 (Tex. App.CWaco 1993, writ denied). In the absence
of findings of fact, a trial court=s judgment implies
all necessary facts required to support it. 
Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990).  It is well established in Texas that an
individual cannot be held personally liable under the TCHRA.  DeMoranville v. Specialty Retailers, Inc.,
909 S.W.2d 490, 494 (Tex. App.CHouston [14th Dist.] 1995) rev=d in part on other
grounds, 933 S.W.2d 490 (Tex. 1996). 
Because Winters= discrimination suit against Gordon was
without merit, we find the trial court did not abuse its discretion in awarding
attorney fees to Gordon.

Winters= second point of
error is overruled, and the judgment of the trial court is affirmed.

 

/s/      J. Harvey Hudson

Justice

 

Judgment
rendered and Opinion filed March 18, 2004.

Panel
consists of Justices Yates, Hudson, and Fowler.











[1]  Gordon also
explained the effect of the revocation in her deposition:

Q: So,
after December 20th of 1999, Mr. Winters continued to do underwriting work, but
he could not sign off on underwriting proposals?  Am I correct about that?  

A: No,
that=s not the case. 
He could underwrite the file.  But
prior to mailing it out under his signature, he had to have approval from
another person.  But he still signed the
proposals.

Q: That is
what I am saying.  He continued to
discharge the job responsibilities of an underwriter except that the final
product had to be approved by somebody else?

A: Yes.

Q: Did his
job responsibilities change?

A: No.





[2]  Similarly, in a March 7, 2003,
performance review, Gordon stated, AI have addressed performance issues on Craig Winters. . .
.  Craig has improved his performance.@ 






[3]  The scale on
which the files are judged contains four categories: very good, good, needs
improvement, and unsatisfactory.  





[4]  We necessarily
invoke the Apretext@ model
described by the federal courts because there is no direct evidence in the
record to support discrimination.  See
Quantum, 47 S.W.3d at 476-77.  





[5]    The court
distinguishes between interlocutory and final decisions.  Mattern, 104 F.3d at 708.  In analyzing Title VII case law, the Fifth
Circuit explains that no adverse employment action occurs merely because there
is an increased chance of discharge through documented reprimands. See id.    





[6]  There is also
conflict within Winters=s own deposition testimony.  At one point he states that Gordon
specifically told him that he would not survive the period from May 2nd.  Later in the same deposition he states, ADeanne implied that I would not survive this B this period.@
(emphasis added).  A fact issue is
created when a party=s testimony is inconsistent.  Clifton v. Hopkins, 107 S.W.3d 755, 759 (Tex. App.CWaco 2003, no pet.). 






[7]  Winters
elaborated, AAgain, I think [Gordon] was very impatient for
results.  She was under a tremendous
amount of pressure, both corporately at a national level and at the branch
level.  This could produce an
intimidating work environment where you didn=t feel
comfortable approaching Ms. Gordon, and B and
actually, I preferred to approach [Hall].@





[8]  Irrespective of
any claims of racial animus, there is evidence that Gordon may have been a
difficult person to work with. 
Initially, Winters went to Barbara Washington, the human resources
manager, to complain about communication problems with Gordon.  Although Winters criticizes Washington for
taking no action, it is instructive that Washington explained to Winters that
Gordon was sometimes difficult to deal with and gave him a picture of a field
marshal, which was intended as a representation of Gordon=s demeanor.   





[9]  For example, Winters claims that he
was told by the client to use a template proposal for a large client; however,
Gordon had told him to use a detailed proposal, and she disciplined Winters for
his decision.  Gordon later described
this incident as a Aprofessional disagreement.@ 
The Bank United Y2K issue is another example.  Here, Gordon disciplined Winters for not
evaluating Y2K exposure, whereas, he claims that he had done so and received
approval for his actions from Gordon=s supervisor. 





[10]  Although we
believe the lack of any evidence establishing race as the basis for Gordon=s decision to discipline Winters forecloses the
possibility that a fact issue exists with regard to racial prejudice, Winters=s attempt at establishing a case of disparate
treatment also has flaws.  Winters questions why other
employees were not disciplined or reprimanded for their mistakes.  However, several of these employees may not
be considered in the disparate treatment analysis because the alleged
preferential treatment did not occur under nearly identical circumstances.  First, Brian Specht cannot be used in a
disparate employee analysis because he did not report directly to Gordon.  Little, 924 F.2d at 97 (finding that
plaintiff and coworker could not meet the Anearly identical circumstances@ test because each did not report
to the same supervisor).  Second, Lewis
Hall=s negative performance evaluation
as the Department manager cannot be considered because Hall was serving as
Winters=s supervisor.